# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SKY ANGEL U.S., LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1834 (RC) |
| | : | | |
| v. | : | Re Document No.: | 5 |
| | : | | |
| NATIONAL CABLE SATELLITE | : | | |
| CORPORATION d/b/a C-SPAN, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS

## I.  INTRODUCTION

This litigation arises out of the defendant's termination of a contract in which it granted the plaintiff a right to distribute reception of the C-SPAN television networks in real-time by means of a secure internet-based protocol stream.  The plaintiff now brings claims under Sections 1 and 2 of the Sherman Act, alleging that the members of the defendant's board of directors partook in a group boycott and sought to maintain a monopoly over the market for real-time, multichannel video programming distribution services.  The defendant moves to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.  The Court finds that it has subject matter jurisdiction over the plaintiff's claims, but will dismiss the complaint without prejudice based on the plaintiff's failure to state a claim.  The plaintiff will be given leave to amend its complaint.

## II.  BACKGROUND

### A.  The Parties

The plaintiff, Sky Angel U.S., LLC ("Sky Angel"), is a Florida-based company that operates FAVE-TV—a subscription service that distributes the content of television networks in real time, with a focus on "faith-based" and "family oriented" video programming.  *See* Compl. (Dkt. No. 1) ¶¶ 7–8.  FAVE-TV's programming lineup includes some mainstream networks, such as Fox News Channel and the Hallmark Movie Channel, as well as some lesser-known religious programming as part of its faith-based repertoire.  *See* Compl. Exs. A & B (Dkt. Nos. 1-2 & 1-3).  Sky Angel's system uses a closed and encrypted fiber-optic transmission path to carry the video programs to central locations, then distributes the programming from those central locations to television-connected set-top boxes via high-speed internet connections.  *See* Compl. (Dkt. No. 1) ¶ 9.

The defendant, National Cable Satellite Corp., doing business as C-SPAN ("C-SPAN"), is a D.C.-based non-profit corporation that was created by the cable television industry and distributes video of legislative proceedings and other programming via three networks—C-SPAN, C-SPAN2, and C-SPAN3.  *See id.* ¶ 13.  C-SPAN's board of directors consists of many high-ranking executives and board members from some of the nation's largest telecommunications companies, including representatives from some of the largest multichannel video programming distributors ("MVPDs").  *See id.* ¶ 36.  Sky Angel alleges that C-SPAN is controlled by cable industry MVPDs, the top ten largest of which hold seats on C-SPAN's board.  *See id.* ¶ 37.

### B.  The Parties' 2009 Contract

On May 28, 2009, Sky Angel and C-SPAN entered into an affiliation agreement (the "IPTV Agreement"), under which C-SPAN granted to Sky Angel a non-exclusive right to carry the C-SPAN networks "by means of an internet-protocol based stream which shall be secure and capable of being accessed only in a manner which would not allow any form of subsequent distribution . . . , including without limitation, distribution over public Internet."  *See* Compl. Ex. E (Dkt. No. 1-6) § 1(a).  The IPTV Agreement had a term of two years and was subject to renewal.  *See id.* § 2.

C-SPAN and C-SPAN2 went "live" on FAVE-TV on or about July 10, 2009.  *See* Compl. (Dkt. No. 1) ¶ 33.  But on July 13, 2009, Peter Kiley sent an email on behalf of C-SPAN to Sky Angel's Executive Vice President that, on its face, confirms Sky Angel's earlier "agree[ment] to take C-SPAN and C-SPAN2 off [FAVE-TV] pending [C-SPAN's] review of [Sky Angel's] distribution technology and a precise legal framework."  *Id.*  Mr. Kiley's email also expresses C-SPAN's belief that the "IPTV [A]greement does not allow for the type of delivery" implemented by Sky Angel.  *Id.*  Sky Angel alleges that, following this review, C-SPAN never provided a "valid explanation" for its termination of the IPTV Agreement.  *See id.* ¶ 35. C-SPAN, in its filings, has asserted that Sky Angel's distribution technology includes use of public internet and thus breaches the IPTV Agreement, *see* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 29, but Sky Angel claims that it was not informed of the basis for C-SPAN's breach of contract theory until C-SPAN made the assertion before the Court, *see* Pl.'s Mem. P. & A. Opp'n Mot. Dismiss (Dkt. No. 7) at 34.  To date, C-SPAN's networks have not been reintroduced into FAVE-TV's lineup.

### C.  Procedural Background

Before bringing suit in this Court, Sky Angel filed a complaint with the Federal Communications Commission ("FCC") against Discovery Communications, LLC ("Discovery") arising out of a separate, but similar, contract dispute.  As it did with C-SPAN, Sky Angel had entered into an affiliate agreement with Discovery (the "Discovery Agreement") allowing Sky Angel to distribute Discovery's programming networks—including Discovery Channel and Animal Planet—on FAVE-TV.  *See* Compl. (Dkt. No. 1) ¶ 58.  After deciding that Sky Angel's distribution method was "not satisfactory," Discovery notified Sky Angel of its intention to terminate the Discovery Agreement.  *See Sky Angel U.S., LLC*, 25 FCC Rcd. 3879, 3880 (Apr. 21, 2010).  In March 2010, before the termination took effect, Sky Angel filed a program access complaint against Discovery with the FCC pursuant to Section 628(b) of the Communications Act, 47 U.S.C. § 548(b), and its implementing regulations.  *See id.*  Sky Angel's complaint alleged that, like C-SPAN, Discovery was motivated by an intent to stifle competition and never explained why it determined that Sky Angel's distribution method was unsatisfactory.  *See id.*

Shortly after filing its petition, Sky Angel also moved the agency for a temporary standstill to keep the Discovery Agreement in effect while the administrative proceeding was pending.  *See id.* at 3879–80.  Applying a four-factor test similar to that used by the courts in a preliminary injunction analysis, the FCC denied Sky Angel's emergency petition for a temporary standstill and found that Sky Angel "has not carried its burden of demonstrating that it is likely to succeed in showing on the merits that it is an MVPD entitled to seek relief under the program access rules."  *Id.* at 3882.  Specifically, the agency found that the term "channel" might not apply to Sky Angel, whose distribution method relies on the subscriber's internet service provider rather than its own transmission path.  *See id.* at 3883.  The FCC noted, however, that

this finding was not an ultimate conclusion as to the merits of Sky Angel's complaint, but was instead made solely to determine whether Sky Angel was entitled to the "extraordinary relief of a standstill . . . ." *Id.* at 3884.  In March 2012, the FCC issued a notice seeking public comment on the proper interpretation of "channel" and "MVPD" under the Communications Act, noting that "[t]he interpretation of these terms has legal and policy implications that extend beyond the parties to this complaint." *Public Notice:  Media Bureau Seeks Comment on Interpretation of the Terms "Multichannel Video Programming Distributor" and "Channel" as Raised in Pending Program Access Complaint Proceeding*, 27 FCC Rcd. 3079, 3079 (Mar. 30, 2012).  Sky Angel maintains that it "competes directly in the MVPD market" but alleges that the FCC has "withdrawn from or declined to occupy the field on which Sky Angel must compete . . . ." Compl. (Dkt. No. 1) ¶¶ 24, 59.

In November 2012, Sky Angel filed a complaint against C-SPAN in this Court asserting two claims under the Sherman Antitrust Act of 1890 (the "Sherman Act").  *See id.* ¶¶ 60–67. Count I of the complaint alleges that C-SPAN's termination of the IPTV Agreement constitutes an agreement among C-SPAN's cable MVPD board members unreasonably restraining trade with Sky Angel—a group boycott and *per se* violation of Section 1 of the Sherman Act.  *See id.* ¶ 44.  Under Count II, Sky Angel alleges that C-SPAN's cable MVPD board members possess monopoly power in the market for real-time multichannel video distribution services, and that C-SPAN's termination of the IPTV Agreement was an unlawful maintenance of that monopoly in violation of Section 2 of the Sherman Act.  *See id.* ¶¶ 64–67.  Among other relief, Sky Angel seeks an order requiring that C-SPAN license its programming to Sky Angel under the terms of the IPTV Agreement "as if it had been perpetually renewed through the date of the order and thereafter for a period of no less than ten (10) years . . . ."  *See id.* ¶ VIII.B.

### III.  ANALYSIS

C-SPAN moves to dismiss Sky Angel's entire complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5).  With respect to subject matter jurisdiction, it is C-SPAN's position that Section 628 of the Communications Act, 47 U.S.C. § 548, grants the FCC exclusive jurisdiction over this case.[1]  C-SPAN also argues that Sky Angel does not state a claim because it has not sufficiently pleaded "concerted activity" as required for its Section 1 claim, the "relevant market" nor market power for its Section 2 claim, nor the antitrust injury required for both claims.  The Court will address each of these arguments in turn.

### A.  Subject Matter Jurisdiction

#### 1.  Legal Standard

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  It is the plaintiff's burden to establish by a preponderance of the evidence that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a Rule 12(b)(6) motion for failure to state a claim.  *See Macharia v. United States*, 334 F.3d 61,

---

[1] C-SPAN also moves to dismiss for lack of injury.  *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 27–32.  Because that analysis encompasses additional considerations of "antitrust injury" beyond the minimum constitutional requirement established by Article III, the Court will analyze injury as part of its Rule 12(b)(6) analysis and not as a matter of jurisdiction. *See also Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 312 n.1 (D.D.C. 2011).

64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

### 2. FCC Exclusive Jurisdiction

C-SPAN's motion to dismiss begins with the curious assertion that the district court lacks subject matter jurisdiction over Sky Angel's two Sherman Act claims. But the Sherman Act plainly falls within the Court's federal question jurisdiction. Under Section 4, "[t]he several district courts of the United States are invested with jurisdiction to prevent and restrain violations of" the Sherman Act. 15 U.S.C. § 4; *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

C-SPAN does not directly challenge this basic rule of jurisdiction, but attempts to cast doubt upon it by suggesting—without arguing explicitly—that Section 628 of the Communications Act supersedes the Sherman Act insofar as it relates to program access disputes and vests exclusive jurisdiction over such claims to the FCC. *See, e.g.*, Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 9 ("Sky Angel may not circumvent the exclusive jurisdiction of the FCC and the courts of appeal by reframing its program access claim as an antitrust count rather than a Section 628 count."). But C-SPAN does not provide any on-point legal support for its assertion. "Provisions for agency review do not restrict judicial review unless the 'statutory

scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S.Ct. 3138, 3150 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).  "Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review."  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).

Section 628 was enacted as part of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460.  The act included an express savings clause providing that "[n]othing in this Act or the amendments made by this Act shall be construed to alter or restrict in any manner the applicability of any Federal or State antitrust law."  *See id.* § 27, 106 Stat. 1503 (codified at 47 U.S.C. § 521 note).  Congress left the implementation of Section 628 and determination of its boundaries up to the FCC, *see* 47 U.S.C. § 548(c), and the FCC has determined that "Congress specifically adopted the program access regime, including Section 628(b), as a new remedy *separate and apart* from antitrust enforcement" and "that antitrust and program access laws address similar but not identical concerns."  *Verizon Tel. Cos.*, 26 FCC Rcd. 13,145 ¶ 45 (Sept. 22, 2011) (emphasis added) (internal quotation marks omitted); *see also* S. Rep. No. 102-92, at 29 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1162 ("The legislation provides new FCC remedies and does not amend existing antitrust laws.  All antitrust and other remedies which can be pursued under current law by multichannel video programming distributors are therefore unaffected by this section.").  C-SPAN's proposed interpretation of the Communications Act's procedural structure would also deprive parties of meaningful review of Sherman Act claims, as the FCC lacks jurisdiction to

hear claims arising directly under that law.  *See, e.g.*, *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1178 (10th Cir. 2005); *see also United States v. Radio Corp. of Am.*, 358 U.S. 334, 343–44 (1959) ("[T]he FCC was not intended to have any authority to pass on antitrust violations as such . . . .").  C-SPAN cannot dodge this Court's jurisdiction over the Sherman Act claims in this case by arguing that the facts overlap in part with a potential Section 628 claim, and nothing more.[2]

*National Cable Television Co-op, Inc. v. Lafayette City-Parish*, No. 10-2554-KHV-DJW, 2010 WL 4868158 (D. Kan. Nov. 23, 2010), which C-SPAN relies upon, is inapposite.  That case involved a claim in which the plaintiff sought declaratory judgment as to the applicability of Section 628 itself.  *See id.* at *1.  Because the Declaratory Judgment Act does not itself create a case or controversy within the jurisdiction of the Article III courts, the justiciability of the plaintiff's claim thus relied directly on Section 628.  *See id.* at *3.  Because the court found that Section 628 lies within the exclusive jurisdiction of the FCC in the first instance and the court of appeals upon review, the claim was dismissed under Rule 12(b)(1).  *See id.* at *4–7.  By contrast, Sky Angel brings two claims directly under the Sherman Act and not under Section 628 or the

---

[2] The Court similarly finds curious C-SPAN's characterization of this issue as a failure to exhaust administrative remedies, as C-SPAN denies that "exhaustion" of the Section 628 administrative adjudication process would then confer jurisdiction upon this Court.

It seems appropriate for the Court to consider the doctrine of primary jurisdiction, under which it may postpone this case and direct Sky Angel to pursue this matter as a Section 628 claim before the FCC in the first instance.  *See, e.g.*, *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956) ("Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." (internal quotation marks omitted)).  C-SPAN, however, has expressly disavowed any desire to pursue this option, *see* Def.'s Reply Supp. Mot. Dismiss (Dkt. No. 8) at 4 n.1, and the Court will not invoke the primary jurisdiction doctrine *sua sponte* at this juncture.

Declaratory Judgment Act, and so the Kansas court's analysis is not appropriate here.  The Court

finds that it has subject matter jurisdiction over Sky Angel's Sherman Act claims.

## B.  Failure to State a Claim

Having determined that it has jurisdiction over Sky Angel's Sherman Act claims, the

Court now turns to C-SPAN's arguments that the complaint fails to state a claim under Rule

12(b)(6).  First, C-SPAN argues that Sky Angel failed to plead the requisite "concerted activity"

to support its Section 1 claim.  With respect to the Section 2 claim, C-SPAN asserts that Sky

Angel neither defined a sufficient "relevant market" nor adequately pleaded that C-SPAN wields

monopoly power over that market.  Finally, C-SPAN argues that neither count is supported by

the required "antitrust injury" element.  The Court addresses each of these issues in turn.

### 1.  Legal Standard

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain

statement of the claim" in order to give the defendant fair notice of the claim and the grounds

upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

Thus, a motion to dismiss pursuant to Rule 12(b)(6) tests whether a plaintiff has properly stated a

claim; not the plaintiff's ultimate likelihood of success.  *See Scheuer v. Rhodes*, 416 U.S. 232,

236 (1974).  A court considering such a motion presumes that the complaint's factual allegations

are true and construes them liberally in favor of the plaintiff.  *See, e.g.*, *United States v. Philip

Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to

plead all elements of its prima facie case in the complaint.  *See Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nonetheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The factual matter "must be enough to raise a right to relief above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Under this "plausibility" standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court considering a motion to dismiss need not accept a plaintiff's legal conclusions as true, *id.*, nor must a court presume the accuracy of legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

### 2.  *Per Se* Group Boycott (Count I)

Sky Angel alleges that C-SPAN's board of directors made a horizontal agreement to boycott Sky Angel—a *per se* illegal restraint of trade under the Sherman Act.  A party seeking redress under Section 1 of the Sherman Act must allege "(1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to unreasonably restrict trade in the relevant market, which (3) affects interstate commerce."  *ASA Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 215 (D.D.C. 2005); *see also* 15 U.S.C. § 1.  The parties' dispute centers on the first of these elements—namely, whether the allegations in Sky Angel's complaint give rise to a reasonable inference that C-SPAN's termination of the IPTV Agreement was part of an express or tacit "agreement for concerted activity" by its cable MVPD board members to unreasonably restrain competition.

### a.  Agreement Within a Single Entity

C-SPAN argues that Sky Angel's complaint against C-SPAN alone cannot stand because "[t]he *sine qua non* of a Section 1 violation is the involvement of multiple parties."  Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 16.  While C-SPAN is correct that Section 1 "does not reach conduct that is 'wholly unilateral[,]'" *Copperweld Corp. v. Independence Tube Corp.*, 467

U.S. 752, 768 (1984) (quoting *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968)), the concerted

action analysis "does not turn simply on whether the parties involved are legally distinct

entities." *Am. Needle, Inc. v. Nat'l Football League*, 130 S.Ct. 2201, 2209 (2010).  Because the

Sherman Act "is aimed at substance rather than form[,]" *United States v. Yellow Cab Co.*, 332

U.S. 218, 227 (1947), the Supreme Court has "eschewed such formalistic distinctions in favor of

a functional consideration of how the parties involved in the alleged anticompetitive conduct

actually operate." *Am. Needle*, 130 S.Ct. at 2209.

    When determining whether a single entity is capable of engaging in concerted action for

purposes of Section 1, "[t]he relevant inquiry . . . is whether there is a contract, combination[,] or

conspiracy amongst separate economic actors pursuing separate economic interests such that the

agreement deprives the market place of independent centers of decisionmaking, and therefore of

diversity of entrepreneurial interests." *Id.* at 2212 (citations and internal quotation marks

omitted).  And although there is a presumption that agreements within a single firm constitute

independent action, "[a]greements made within a firm can constitute concerted action . . . when

the parties to the agreement act on interests separate from those of the firm itself . . . ." *Id.* at

2215.

    C-SPAN attempts to distinguish *American Needle* by arguing that the coverage provided

on the C-SPAN networks is unique and would not be separately provided by the cable MVPDs if

the C-SPAN entity did not exist.  *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 17 n.6.

The football teams who formed a joint venture to administer their intellectual property in

*American Needle*, by contrast, had individually licensed their intellectual property before

forming the joint venture.  *See id.*  While that was a factor in the Supreme Court's application of

its "functionality" test, the Court did not frame it as a bright-line rule.  *See Am. Needle*, 130 S.Ct.

at 2214–15.  Moreover, although the production of C-SPAN programming is uniquely in

C-SPAN's hands, the MVPDs each distribute the C-SPAN networks on individually-priced cable

or satellite plans.  *See* Compl. (Dkt. No. 1) ¶ 50.  Indeed, Sky Angel alleges that the termination

of the IPTV Agreement resulted in a sacrifice of C-SPAN's revenue for no legitimate purpose

other than to create barriers for those who compete with the cable MVPDs and who would exert

downward pressure on the prices of their independently-priced subscription packages.  *See id.*

¶¶ 38–40.  This supports a plausible inference that the cable MVPD board members may have

"act[ed] on interests separate from the firm itself" and that refusal to license C-SPAN's content

to other carriers "deprives the marketplace of independent centers of decisionmaking, and

therefore of diversity of entrepreneurial interests, and thus of actual or potential competition" in

the form of competitive pricing for real-time, multichannel video programming distribution

subscription packages.  *Am. Needle*, 130 S.Ct. at 2212, 2215 (citations and internal quotation

marks omitted); *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 287 (4th Cir.

2012) (finding that, sufficient to survive the Rule 12(b)(6) stage, the plaintiff's allegations

"reasonably support . . . an inference" that members of a single entity acted as a plurality for

purposes of Section 1).  The Court finds that the complaint raises a plausible inference that

C-SPAN, as a single entity, may be *capable* of violating Section 1.

### b.  Agency

Separate from whether C-SPAN board members are capable of concerted activity under

Section 1, the parties also dispute whether Sky Angel has pleaded a factual context sufficient to

support a plausible inference that an agreement among C-SPAN's cable MVPD board members

did, in fact, exist.  "Because [Section 1] does not prohibit all unreasonable restraints of trade but

only restraints effected by a contract, combination, or conspiracy, the crucial question is whether

the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (citations and internal quotation marks omitted).  At the Rule 12(b)(6) stage, the Supreme Court has held, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.

Sky Angel relies on an agency theory to support its allegation that the cable MVPDs on C-SPAN's board were behind the decision to terminate the IPTV Agreement.  Specifically, without alleging any direct involvement by the board of directors—such as a formal vote to terminate the contract or an off-the-record direction given to C-SPAN's management—Sky Angel simply alleges that "[t]he acts charged in [its] complaint as having been done by defendant or its co-conspirators were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of defendant's business or affairs . . . ."  Compl. (Dkt. No. 1) ¶ 12; *see also, e.g.*, *id.* ¶ 34 (alleging that Peter Kiley's communication seeking removal of C-SPAN networks from FAVE-TV "was performed in his official capacity as an authorized agent of C-SPAN and reflected the corporate act of C-SPAN's management and its Board of Directors").  The complaint identifies only a single agent on behalf of C-SPAN, and Sky Angel argues that it "is entitled to *presume* that C-SPAN's actions are the product of an authorized majority of its governing body."  Pl.'s Mem. P. & A. Opp'n Mot. Dismiss (Dkt. No. 7) at 33 (emphasis added).  But liability under Section 1 of the Sherman Act requires a "plurality of actors[,]" *Copperweld*, 467 U.S. at 769, and Sky Angel has not demonstrated that agency principles can be used to impute the actions of one individual to multiple superiors.  "Concerted action" between multiple persons remains a *fact* that must be pleaded.

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982), cited by Sky Angel, is not to the contrary.  In *Hydrolevel*, the Supreme Court applied agency principles to hold that an agent acting within the scope of his apparent authority could participate in a conspiracy on behalf of a business entity for purposes of a Section 1 claim.  *See id.* at 571.  But the agent in that case did not act alone; rather, he conspired with other defendants who, in turn, were acting on behalf of different corporate entities.  The "plurality of actors" requirement was thus still satisfied, and courts have since declined to extend *Hydrolevel* to allegations against a single individual acting on behalf of multiple others without co-conspirators.  *See, e.g.*, *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1008–10 (3d Cir. 1994) (distinguishing *Hydrolevel*).

Once the conclusory inference of agreement—through use of agency law—is stripped away from the complaint, Sky Angel's Section 1 claim rests solely on the fact that the top cable MVPDs have representatives on C-SPAN's board of directors.  But merely pleading that multiple entities hold positions on a board of directors does not establish a horizontal agreement for purposes of Section 1.  *See Nat'l ATM Council, Inc. v. Visa Inc.*, No. 11-cv-01831 (ABJ), 2013 WL 525463, at *17 (D.D.C. Feb. 13, 2013) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)).  Because Sky Angel does not provide any factual context for the cable MVPD board members' alleged agreement, the Court will dismiss Count I without prejudice.

### 3.  Monopoly Maintenance (Count II)

For its second claim, Sky Angel alleges that C-SPAN terminated the IPTV Agreement in order to maintain monopoly power over the real-time, multichannel video programming distribution services market in violation of Section 2 of the Sherman Act.  *See* Compl. (Dkt.

15

No. 1) ¶¶ 64–67.  C-SPAN argues that this claim should be dismissed for failure to plead that

C-SPAN holds market power in the relevant market.  "The offense of monopoly under [Section

2] has two elements:  (1) the possession of monopoly power in the relevant market and (2) the

willful acquisition or maintenance of that power as distinguished from growth or development as

a consequence of a superior product, business acumen, or historic accident."  *United States v.*

*Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *accord United States v. Microsoft Corp.*, 253 F.3d

34, 50 (D.C. Cir. 2001) (en banc) (per curiam); *see also* 15 U.S.C. § 2.  An important part of the

analysis relates to the definition of the "relevant market," which traditionally has two

components:  the product market and the geographic market.  *See S. Pac. Commc'ns Co. v. Am.*

*Tel. & Tel. Co.*, 740 F.2d 980, 1000 (D.C. Cir. 1984).  "The plaintiff bears the burden of

establishing the relevant market."  *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C.

Cir. 1986) (citing *Walker Process Equip. Co. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177–

78 (1965)).  Once the relevant market is defined, a plaintiff must show that the defendant holds

market power over the relevant market.  *See S. Pac. Commc'ns Co.*, 740 F.2d at 1000.

### a.  Product Market

According to the complaint, the relevant market here is "[r]eal-time, multichannel video

programming distribution services delivered by MVPDs . . . ."  Compl. (Dkt. No. 1) ¶ 22.

C-SPAN argues that Sky Angel does not state a claim under Section 2 because this product

market lacks the precision courts have required at the pleading stage.  *See* Def.'s Mot. Dismiss &

Mem. Supp. (Dkt. No. 5) at 20–22.[3]  "The outer boundaries of a product market are determined

by the reasonable interchangeability of use or the cross-elasticity of demand between the product

---

[3] C-SPAN also argues that the product market definition fails because C-SPAN does not
compete in that market.  However, the Court finds that such an analysis is better undertaken
when determining whether the defendant holds market power over the relevant market, however
defined.  *See infra* Part III.B.3.c.

itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Although courts have not required such an economically technical recitation of the market boundaries at the pleading stage, "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . , and it must be plausible." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal quotation marks omitted).

C-SPAN argues that "[i]t is impossible to know" whether the market includes broadcast television stations, distributors of recorded video programming, and online video distributors ("OVDs")—all of which are mentioned in the complaint as participants in the video program industry. *See* Compl. (Dkt. No. 1) ¶ 15; Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 22. The Court finds this argument to be disingenuous. The complaint clearly states that such participants "are not distributors of real-time, multichannel programming"—the relevant product market at issue here. *See* Compl. (Dkt. No. 1) ¶ 22. C-SPAN's additional argument that it is unclear whether Netflix and Hulu Plus play any role in the relevant product market is similarly flawed, as both services appear to be OVDs and neither offers "real-time, multichannel" programming.

However, while the boundaries of the alleged product market can be ascertained from the complaint, its "rational relation to the methodology courts prescribe to define a market" is thin. *Todd*, 275 F.3d at 200. The complaint specifically alleges that the services of OVDs are not a substitute for those of real-time MVPDs, *see* Compl. (Dkt. No. 1) ¶ 22, but it does not provide a similar "lack of interchangeability" allegation supporting the exclusion of other video program industry participants whose programming is not "real-time" and "multichannel." "If it is not clear whether a product is interchangeable with others, then some detail about lack of

interchangeability should be given" in the complaint.  2B Phillip E. Areeda et al., *Antitrust Law*

¶ 531f (3d ed. 2007); *see also, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430,

436–37 (3d Cir. 1997) (stating that failure to define the market by reference to the reasonable

interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule

12(b)(6) stage).  Due to the technical intricacies and developments in the video program

industry, the FCC's own caution in delineating the boundaries of the statutory MVPD market,

and Sky Angel's further narrowing of the statutory MVPD market to only those offering "real-

time" services, the Court requires more detailed allegations by Sky Angel regarding the supposed

lack of interchangeability between "real-time, multichannel video programming distribution

services delivered by MVPDs" and the other video program industry participants.

### b.  Geographic Market

C-SPAN also argues that Count II must fail for the independent reason that it does not

sufficiently allege a relevant geographic market.  The complaint contains a bare allegation that

"[t]he 50 states of the United States and its districts and territories comprise the relevant

geographic market for MVPD services."  Compl. (Dkt. No. 1) ¶ 23.  "[T]he relevant geographic

market must be sufficiently defined so that the Court understands in which part of the country

competition is threatened."  *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49

(D.D.C. 1998).  A geographic market "need not—indeed cannot—be defined with scientific

precision . . . ."  *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974).  However, the

Supreme Court has held that "the area of effective competition . . . must be charted by careful

selection of the market area in which the seller operates, *and to which the purchaser can*

*practicably turn for supplies*."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)

(emphasis added).  It is not plausible that competition among real-time MVPDs occurs on a

national level, because purchasers do not practically turn to a national market for real-time, multichannel video programming distribution services.  It is conceivable that Sky Angel operates nationwide and competes with the cable MVPDs in many *individual* metropolitan and regional markets comprising the overall United States geographic area, but that is not what Sky Angel has pleaded.  To provide C-SPAN and the Court with notice regarding the scope of the alleged geographic market—or markets—Sky Angel must provide more detail about the geographic scale on which competition actually occurs.

*c.  Market Power*

Even assuming that the product and geographic boundaries of the relevant market were adequately pleaded, C-SPAN argues that the complaint does not allege that C-SPAN holds monopoly power over the relevant market.  "Monopoly power is the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  "The existence of such power ordinarily may be inferred from the predominant share of the market."  *Grinnell*, 384 U.S. at 571.

C-SPAN, of course, is a programming network and not a direct competitor in the market for real-time, multichannel video programming distribution services.  *See* Compl. (Dkt. No. 1) ¶ 11; Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 25.  Sky Angel argues that the market power lies not in the C-SPAN entity itself, but in "the authorized majority of the Board of Directors of C-SPAN."  Pl.'s Mem. P. & A. Opp'n Mot. Dismiss (Dkt. No. 7) at 37.  The complaint alleges that cable MVPDs "dominate" the real-time, multichannel video programming distribution services market with a *collective* sixty percent market share.  *See* Compl. (Dkt.

No. 1) ¶ 37.[4]  But as C-SPAN points out, "Sky Angel may not aggregate the shares of multiple other entities" to arrive at a monopoly.  *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 26 (collecting cases).  "[W]hen a small number of large sellers dominates a market, this is described as an oligopoly."  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, No. 11-cv-01049 (PLF), 2013 WL 673778, at *7 (D.D.C. Feb. 26, 2013).  "A monopoly arises when a *single* firm 'controls all or the bulk of a product's output, and no other firm can enter the market, or expand output, at comparable costs.'"  *Id.* (quoting 2B Areeda et al., *supra*, ¶ 403a) (emphasis added).

Although there is no D.C. Circuit case law on point, several other courts and at least one other judge in this district have held that a "shared monopoly" theory cannot support a Section 2 claim.  *See id.* at *6 (collecting cases).  The Court agrees.  Where the alleged monopoly is held by multiple separate companies within a market, there is no "monopoly" at all.  Section 1—not Section 2—serves the purpose of prohibiting agreements unreasonably restraining trade in a shared market.  *See Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 390 (D. Md. 1990) ("Oligopoly can, in some cases, violate Sections 1 and/or 3 of the Sherman Act, but *competitors*, by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibitions against monopoly.").  The Court sees no plausible inference from the pleaded facts that a *single* entity wields or threatens to attain monopoly power over the alleged relevant market (both components of which are inadequately pleaded).  Indeed, the complaint is premised on the alleged collective action of *several* cable MVPDs within a single, national market.  For these reasons, the Court will dismiss Count II.

---

[4] Sky Angel's allegation appears to include *all* cable MVPDs, and not just those represented on C-SPAN's board.

4.  Injury

C-SPAN also argues that both claims are inadequately pleaded because the complaint does not sufficiently allege injury.  While Sections 1 and 2 of the Sherman Act illegalize concerted activity restraining trade and monopoly maintenance, respectively, *see* 15 U.S.C. §§ 1–2, Section 4 of the Clayton Antitrust Act of 1914 (the "Clayton Act") provides a civil, private right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."  *Id.* § 15; *see also id.* § 12 (defining "antitrust laws" to include the Sherman Act); *id.* § 26 (providing a private right of action for injunctive relief).  To achieve standing to bring forward a federal antitrust claim, the plaintiff must show that it has suffered both Article III injury and "antitrust injury"—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).[5]  This additional requirement of "antitrust injury" exists where a plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act, as well as cases in which a plaintiff seeks injunctive relief under Section 16.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986).

The Clayton Act, however, does not "allow suit by *every* party affected by an antitrust violator's 'ripples of harm.'"  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982)).  To establish the "irreducible constitutional minimum" of injury to present a case or controversy under Article III, the plaintiff must show (1) that it suffered "injury in fact"—that is, "an

---

[5] Although some courts use the term "antitrust injury" to sweep in the full scope of injury analysis in an antitrust case—including the Article III standard required in every federal proceeding—the Court uses the term "antitrust injury" in this opinion to refer specifically to the additional requirement articulated in *Brunswick*.  *See also* 2A Areeda et al., *supra*, ¶¶ 335c4, 337a.

invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of . . . ," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted); *accord Cheeks of N. Am., Inc. v. Fort Myer Constr. Corp.*, 807 F. Supp. 2d 77, 92 (D.D.C. 2011) (applying the *Lujan* standard to an antitrust case). In addition to the minimum constitutional standing set forth in *Lujan*, in antitrust cases "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489.

### a. Injury in Fact

Sky Angel alleges that C-SPAN's termination of the IPTV Agreement resulted in "lost profits, lost [sic] of business opportunity, loss of the ability to effectively compete, and injury to Sky Angel's prestige and reputation." Compl. (Dkt. No. 1) ¶ 53. These harms are plausibly tied to FAVE-TV's loss of C-SPAN programming, as Sky Angel alleges that customers "wrote to inquire, complain, or request that C-SPAN's programming be restored." *Id.* ¶ 54. C-SPAN argues that, given FAVE-TV's "extremely limited" lineup, "the loss of C-SPAN . . . is highly unlikely to have had any competitive effect at all on Sky Angel." Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 31 n.10. But it stands to reason that, to the contrary, the loss of one of Sky Angel's few mainstream offerings may *more* likely prevent it from effectively competing with the major cable MVPDs, all of whom carry C-SPAN. *See* Compl. (Dkt. No. 1) ¶ 50. At this stage, the Court cannot make that determination. C-SPAN also points out that Sky Angel's complaint does not quantify its lost profits or number of subscribers, but that is not required in order to establish injury in fact at the pleading stage. *See Zenith Radio Corp. v. Hazeltine Res.,*

*Inc.*, 395 U.S. 100, 114 n.9 (1969) (noting that a plaintiff's "burden of proving the fact of damage under . . . the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage").

### b. Antitrust Injury

C-SPAN also argues that Sky Angel has not sufficiently alleged its injury was caused by C-SPAN's supposed violation of antitrust laws—in other words, that Sky Angel's alleged harms do not "flow[] from that which makes defendants' acts unlawful." [6] *Brunswick*, 429 U.S. at 489. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). This requirement serves to prevent application of the antitrust laws where the defendant's violation actually *increases* competition—for example, where an illegal merger allows firms to stay in business, thereby preserving competition.[7] *See,*

---

[6] C-SPAN also argues that Sky Angel has not alleged any injury to competition. *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 30; Def.'s Reply Supp. Mot. Dismiss (Dkt. No. 8) at 14. This, however, would not mean that Sky Angel lacks "antitrust standing," but would instead mean that there is no antitrust violation at all. *See* 2A Areeda et al., *supra*, ¶ 337a ("To say that the plaintiff has not shown any injury to competition is to conclude that the antitrust laws have not been violated at all. [This is not] 'antitrust injury' in the sense that *Brunswick* used the term . . . ."). Regardless, the complaint clearly alleges that termination of C-SPAN's programming on the lower-priced FAVE-TV has allowed the cable MVPDs to "shield themselves from the downward pressure on market prices that would result from the competitive effect of" Sky Angel's participation and that, "[b]y artificially maintaining their dominance in the MVPD market in this way, the cable MVPDs have perpetuated the current, high-price *status quo* and denying [sic] millions of U.S. consumers the full economic benefit of competition." Compl. (Dkt. No. 1) ¶ 51.

[7] Because there can be no antitrust violation without an injury to competition, it may seem contradictory to "postulate[] that competition can be simultaneously impaired (thereby violating the antitrust laws) and enhanced (thereby causing the plaintiff noncognizable losses). There is no real contradiction, because the impairment and enhancement lie in different temporal or market dimensions, as the *Brunswick* case itself illustrates." 2A Areeda et al., *supra*, ¶ 337a.

*e.g.*, *Brunswick*, 429 U.S. at 488.  "It is competition, not competitors, which the [Clayton] Act protects."  *Brown Shoe Co.*, 370 U.S. at 344.

Sky Angel alleges that it lost profits and business opportunities due to C-SPAN's termination of the IPTV Agreement.  *See* Compl. (Dkt. No. 1) ¶¶ 53–57.  The complaint also alleges that this same termination served to boycott Sky Angel and maintain the cable MVPDs' monopoly, thereby reducing competition and allowing the cable MVPDs to maintain artificially high prices.  *See id.* ¶ 51.  From the face of the complaint, it therefore appears plausible that the same alleged violation both reduced competition and injured Sky Angel—that Sky Angel's injury "flows from that which makes [C-SPAN's] acts unlawful."  *Brunswick*, 429 U.S. at 489.  This is sufficient to allege antitrust injury at the pleading stage.  *See also Andrx Pharms.*, 256 F.3d at 813 (holding that an agreement preserving a monopoly, constituting an illegal restraint of trade, caused both antitrust injury and injury in fact to a rival whose exclusion was effected by the agreement).

C-SPAN would have the Court dismiss Sky Angel's complaint on the basis that its termination of the IPTV Agreement was caused by Sky Angel's supposed breach of contract, rather than any antitrust violation by C-SPAN.  *See* Def.'s Mot. Dismiss & Mem. Supp. (Dkt. No. 5) at 29–30.  Specifically, C-SPAN argues that Sky Angel's distribution method uses public internet—a distribution method not permitted by the contract.  *See* Compl. Ex. E (Dkt. No. 1-6) § 1(a).  Although contract interpretation is a matter of law, *see Adkins Ltd. P'ship v. O St. Mgmt., LLC*, 56 A.3d 1159, 1167 (D.C. 2012); *see also* Compl. Ex. E (Dkt. No. 1-6) § 11(c) (selecting District of Columbia law to govern the contract), the Court declines to undertake a breach of contract analysis at the pleading stage, where the contract interpretation issue is not fully briefed and the only facts describing Sky Angel's distribution method are those set forth briefly in the

complaint.  In any event, Sky Angel's complaint alleges that C-SPAN's termination of the IPTV Agreement was motivated by anticompetitive animus, *see* Compl. (Dkt. No. 1) ¶¶ 38–40, and the Court will accept the truth of that allegation for purposes of the pleading stage.  *See Iqbal*, 556 U.S. at 678.

Although Sky Angel's two Sherman Act claims are inadequately pleaded, the Court finds that, if such violations *did* occur, the complaint sufficiently alleges injury in fact and antitrust injury at this stage.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants C-SPAN's motion to dismiss (Dkt. No. 5). The Court finds that it does have subject matter jurisdiction over the two alleged Sherman Act violations and that, presuming at least one of those violations occurred, Sky Angel has pleaded both injury in fact and antitrust injury.  However, the Court also finds that Sky Angel's complaint inadequately pleads causes of action for violations of Sections 1 and 2 of the Sherman Act, and will therefore dismiss the complaint without prejudice.  The Court will grant Sky Angel leave to amend its complaint.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 3rd day of June, 2013.

RUDOLPH CONTRERAS
United States District Judge